NIKO WIITA v. INTERSTATE IRON COMPANY.[1]

February 14, 1908.

Nos. 15,317—(71).

**Defective Fuse—Evidence.**

In an action to recover damages caused by the premature explosion of a charge of dynamite, due to a defective fuse, it is *held* that the evidence justified the trial court in denying a motion for judgment for the defendant notwithstanding a verdict for the plaintiff.

**Same—Question for Jury.**

The fact that the brand of fuse supplied by a mining company for the use of its miners is in general use and favorably known is not conclusive evidence that the company is not guilty of negligence in furnishing that particular kind of fuse for use in its mines. Nor is the fact that a better and safer kind of fuse has been introduced within recent years and come into common use conclusive evidence that the company is negligent in using the older kind. Both facts are but evidence for the consideration of the jury in determining whether the employer failed to exercise the

[1]Reported in 115 N. W. 169.

degree of care required by the circumstances, the nature of the instrumentalities, and the danger to be anticipated from defective appliances.

**Same—Notice to Defendant.**

Notice to the mine captain, who has charge of all underground work, of previous accidents resulting from defects in the fuse in use, is notice to the mining company, although the superintendent of the mine had control over the matter of purchasing and supplying the fuse for the mine.

Action in the district court for St. Louis county to recover $50,000 damages for personal injuries. The case was tried before Cant, J., and a jury which returned a verdict in favor of plaintiff for $15,000. From an order denying its motion for judgment notwithstanding the verdict or for a new trial, defendant appealed. Affirmed.

*Davis & Hollister,* for appellant.

*John R. Heino, Wm. E. Culkin,* and *Warner E. Whipple,* for respondent.

ELLIOTT. J.

The respondent, Niko Wiita, while in the employ of the Interstate Iron Company, working as a miner in the Lincoln mine, was injured by the explosion of a charge of dynamite, and in an action for damages, founded upon the alleged negligence of the company in furnishing him with defective fuse, recovered a verdict for $15,000. From an order denying a motion for judgment notwithstanding the verdict or for a new trial, the defendant appealed to this court. Numerous questions are raised by the assignments of error, but the principal stress is laid upon the claim that the evidence is insufficient to prove negligence on the part of the defendant.

1. Wiita was twenty three years old, and had been in this country for about four years. He had worked for the appellant company for about three days, but he had previously worked in similar mines in Michigan and Wyoming and was reasonably familiar with fuse and the use and properties of dynamite. At the time of the accident Wiita and his partner, Perkio, were working in a drift. They had drilled two holes horizontally into the face of the drift about four feet apart and about the same distance from the floor, and were attempting to "check" or "squib" the holes. This checking or squibbing, as it is called, was done by putting a small charge of dynamite into each hole,

pushing it near the bottom thereof, and exploding it by means of a fuse, thus enlarging the hole and preparing the way for the larger quantity of explosive by which the ore was blasted out. Wiita had prepared the checking blasts for both of the holes by taking two half sticks of dynamite and inserting in the end of each a fulminating cap, which was attached to a piece of double tape fuse. One of these charges was placed in each hole and shoved in about two feet with a swab stick, leaving three or four inches of the free end of the fuse projecting from the holes into the open drift. These projecting ends were split with a knife, so as to expose the powder and cotton thread and render the fuse more easily lighted.

After having thus prepared the charges and the fuses, the candles which each miner carried were applied to the fuses. It seems that Wiita's fuse caught fire and burned all right, but his partner's did not, and Wiita also attempted to light it, without success. Both miners then retired to a place of safety until after one charge exploded. After waiting five or six minutes, Wiita returned to light the fuse for the blast which had not exploded. The smoke was still dense about the hole. Wiita seems to have had two candles in his hand at the time, one of which, for some reason, he placed upon the floor near his feet. He then stuck his swab stick into the hole and lighted the fuse. The candle with which the fuse was lighted blew out, and Wiita leaned over to pick up the other candle. While in this position the charge exploded and drove the swab stick into his left eye and in a downward course through his head. He survived the injury, but is totally blind.

2. The negligence with which the company was charged consisted in furnishing the workmen with a defective kind or brand of fuse, with knowledge or notice or means of knowledge of the fact that it was defective, when another and safer brand of tape was procurable in the market. More specifically the plaintiff claimed and offered evidence tending to show (a) that not merely the particular section of his fuse used by him at the time of his injury, or the particular coil of tape from which the fuse was cut, was defective, but that the tape fuse furnished by the company for the use of the miners at the Lincoln mine was defective as to kind, class, and brand, in that it burned too rapidly and thus produced premature explosions and rendered its

use dangerous; (b) that the defendant company had knowledge of this defect by notice to the captain of the mine through the complaint of certain miners and the reputation of the fuse at the Lincoln mine; and (c) that the tape fuse was not a reasonably safe instrumentality, and that the company was therefore wanting in due care in furnishing it to the miners for use in so dangerous and hazardous a work, in view of the serious nature of the results which were likely to follow its use.

3. The fuse used by the miners was kept in the powder house or room in the mine. It was purchased and brought there in cases and coils, and was placed on tables, from which it was cut and taken by the miners as occasion required. They determined for themselves the length of the fuse for the several blasts. There were two kinds of fuse in use in the mines, known as "tape fuse" and "string fuse," distinguished outwardly by their coverings. Comparatively little of the string fuse had been used in this mine. The tape fuse, of which there were two brands, known as the "Climax" and the "Ensign & Bickford," was wound with tape, while the string fuse was wound with string. This outward covering protected the interior portion of the fuse, which in the tape fuse consisted of a thread of cotton and a train of fine black powder which extended through its entire length, incased and inclosed by jute thread. At the time of the accident the miners were using the double tape fuse; but it does not appear whether it was the Climax or the Ensign & Bickford brand. These brands were, however, so nearly alike that it is difficult, if not impossible, to distinguish them by appearance or quality.

The appellant claimed that the interior structure of the tape and string fuse is the same, and that both burned in the same time and with the same regularity; but there is evidence tending to show that this is not strictly correct, as in the string fuse the jute threads which formed the immediate covering of the powder train were inclosed by gutta percha, while the corresponding covering of the double tape fuse was a preparation of coal pitch. It also appears that this gutta percha was more expensive, and had previously been used only in the higher-priced fuses manufactured for use in firing torpedoes under water. It was claimed that because of the use of gutta percha

string fuse was more impervious to water, more pliable, and thus furnished a better protection for the powder train, and rendered it less liable to be disarranged by the breaking of the outside cover.

The evidence as to whether the string fuse is recognized as safer than the double tape fuse was conflicting, and fairly made an issue for the jury. It appeared that for many years double tape fuse of the general brand furnished the miners in this mine had been in general use and was recognized in the trade as a standard fuse. It was manufactured by all the fuse dealers, and the different brands were so much alike that only experts were able to distinguish them. This condition prevailed until about six years before the time of this trial, when the string fuse seems to have been first placed on the market. Tape fuse had been used so generally that the new type of fuse made its way but slowly. At the time of the trial, however, the Climax Fuse Company, which seems to have manufactured both kinds, was selling one-half as much string fuse as tape fuse, and the sale of the string fuse was increasing. It was rapidly being introduced in the mining districts of Michigan and Minnesota, and was exclusively used in some of the mines. In the summer of 1905 a large proportion of the fuse used by a company which used more than one-half of all the fuse sold in the district was string fuse. A witness who was the defendant's superintendent at the time of the accident, and who thereafter became president of another company, testified that his new company used the string fuse exclusively. It thus appears that the new type of fuse had been introduced a few years before the time of this accident, and that it was making considerable headway towards supplanting the old style of fuse. The most that can fairly be claimed is that it was claimed to be a superior and safer appliance, and that the correctness of the claim had been admitted by many mining men. The old style of tape fuse, which had been in general use for many years, had not been discredited and supplanted, but was still in common use.

The question for the jury to determine was whether the double tape fuse furnished the men was a reasonably safe instrumentality, in view of the dangerous nature of the work; and in determining that fact it was proper for the jury to consider the evidence which tended to show that a safer and equally effective fuse was obtainable.

If the double tape fuse was a reasonably safe article, the defendant was not negligent merely because it did not furnish a different type of fuse, although the latter was a safer and better article. This rule is settled in this jurisdiction. As said in Monsen v. Crane, 99 Minn. 186, at 188, 108 N. W. 934: "An employer is not as a matter of law negligent if he fails to adopt every device or apparatus which is recognized as a proper improvement upon his machine. It is for the jury to determine whether the particular instrumentality, in the condition in which the evidence shows it to be, is or is not reasonably safe, and to aid them in determining this fact they have the right to consider whether there are well-known devices in general use which, if adopted, would have reduced. the danger to the employee. * * * It is not the employer's duty to furnish any particular kind of tools, implements, or appliances. Failure to conform with common usage is not negligence as a matter of law. It is merely evidence to be considered by the jury. He is not required to provide machinery similar to that used in other establishments, although it may be less dangerous than that used by him. Whether that which is furnished by him is reasonably safe is to be determined by its actual condition, and not conclusively by comparing it with other machines used by others for similar work." To the same effect see Stiller v. Bohn Mnfg. Co., 80 Minn. 1, 82 N. W. 981.

This rule necessarily leads to the conclusion that the fact that the appliance is in general use throughout the country in the same or similar lines of work is not conclusive upon the question of negligence, if in fact the master has not used proper care in its selection and it is not reasonably safe. In Anderson v. Fielding, 92 Minn. 42, 99 N. W. 357, 104 Am. St. 665, the court said: "The law of this state is that a negligent act will not be excused by the fact that it is customary. Proof of custom, however, is evidence, but not conclusive as to whether the act is negligent. This rule applies to the act of furnishing and selecting tools and appliances for the use of employees." Craver v. Christian, 36 Minn. 413, 31 N. W. 457, 1 Am. St. 675; O'Malley v. St. Paul, M. & M. Ry. Co., 43 Minn. 289, 45 N. W. 440; Flanders v. Chicago, St. P., M. & O. Ry. Co., 51 Minn. 193, 52 N. W. 544; Lawson v. Truesdale, 60 Minn. 410, 62 N. W. 546; Hinton v. Eastern

Ry. Co. of Minn., 72 Minn. 339, 75 N. W. 373; Attix v. Minnesota Sandstone Co., 85 Minn. 142, 88 N. W. 436.

General custom is not as a matter of law in itself due care. Wabash Railway Co. v. McDaniels, 107 U. S. 454, 2 Sup. Ct. 932, 27 L. Ed. 605. As said by Mr. Justice Holmes: "What usually is done may be evidence of what ought to be done; but what ought to be done is fixed by a standard of reasonable prudence, whether it is usually complied with or not." Texas & Pac. Ry. Co. v. Behymer, 189 U. S. 468, 470, 23 Sup. Ct. 622, 47 L. Ed. 905. The master is not, therefore, required to adopt every new device by way of improvement upon the appliances furnished by him to his men. It is sufficient if such as are supplied are reasonably safe. But, as said in Hoye v. Chicago, M. & St. P. Ry. Co., 46 Minn. 269, 48 N. W. 1117, and quoted in Gilbert v. Duluth General Electric Co., 93 Minn. 99, 105, 100 N. W. 653, 655, 106 Am. St. 430: "Reasonable care is all that is required. But this must be proportionate to the risks to be apprehended and guarded against." The degree of care must be commensurate with the dangerous character of the article, the circumstances under which it is used, and the seriousness of the dangers to be anticipated. 8 Current Law, 1094, and cases there cited. Reasonable care may thus under certain circumstances and conditions be the highest degree of care. Thus in Mattson v. Minnesota & North Wisconsin R. Co., 95 Minn. 477, 104 N. W. 443, 70 L. R. A. 503, 111 Am. St. 483, it was said that the degree of care required of persons having the possession and control of dangerous explosives, such as dynamite, is of the highest.

The duty resting upon the master who furnishes instrumentalities such as the fuse used in this case, for use in discharging high explosives, is well stated in Mather v. Rillston, 156 U. S. 391, 398, 15 Sup. Ct. 464, 39 L. Ed. 464, where Mr. Justice Field said: "All occupations producing articles or works of necessity, utility, or convenience may undoubtedly be carried on, and competent persons, familiar with the business and having sufficient skill therein, may properly be employed upon them; but in such cases, where the occupation is attended with danger to life, body, or limb, it is incumbent on the promoters thereof and the employers of others thereon to take all reasonable and

needed precautions to secure safety to the persons engaged in their prosecution, and for any negligence in this respect, from which injury follows to the persons engaged, the promoters or the employers may be held responsible and mulcted to the extent of the injury inflicted. The explosive nature of the materials used in this case, and the constant danger of their explosion from heat or collision, as already explained, was well known to the employers, and was a continuing admonition to them to take every precaution to guard against explosions. Occupations, however important, which cannot be conducted without necessary danger to life, body, or limb, should not be prosecuted at all without all reasonable precautions against such dangers afforded by science. The necessary danger attending them should operate as a prohibition to their pursuit without such safeguards. * * * If an occupation attended with danger can be prosecuted by proper precautions without fatal results, such precautions must be taken by the promoters of the pursuit or employers of laborers thereon. Liability for injuries following a disregard of such precautions will otherwise be incurred, and this fact should not be lost sight of."

4. We now come to the question whether there was sufficient evidence to show that the double tape fuse furnished by the company to its miners was not a reasonably safe instrumentality, and, if unsafe in fact, whether the company had knowledge of the fact or of circumstances which charged it with notice. It purchased the fuse in the open market, and, the defect not being apparent or ascertainable by mere inspection, it cannot be charged with negligence on account of its defective condition, unless it knew or ought to have known of its condition. As we have seen, that style of fuse had been in common use for many years, and that fact was for the consideration of the jury. There was also evidence tending to show that a safer and superior article of fuse had come into common use in the vicinity, and that fact was also for the consideration of the jury. The respondent claims that there had been numerous accidents of a similar character, occurring under substantially similar conditions, which were caused by defects in the double tape fuse, which caused premature explosion such as occasioned the injury to Wiita. It appeared that reasonable safety to the miners was secured if the two or two and one half feet of fuse

ordinarily used in checking operations burned for one to one and one
half minutes before exploding the charge.   The evidence is that on
the occasion of the accident the fuse burned so rapidly as to cause the
explosion within ten seconds after it was lighted.   If the jurors be-
lieved that this estimate of time was correct, they were certainly jus-
tified in the conclusion that that particular piece of fuse was defective.
It was not claimed, of course, that all the fuse which was furnished
to the miners was bad.   But it is claimed that experience had shown
that enough of it was defective to make it negligent for the company
to furnish that kind or brand of fuse to the men, and require them
to take the chances involved in getting hold of defective pieces.   It is
also conceded that the defects which caused too rapid combustion were
not discoverable by an examination of the exterior of the fuse, and
therefore ordinary inspection was useless.

But several accidents such as that which injured Wiita had previ-
ously occurred in the mine and had been reported to the captain of
the mine.   Thus one witness testified that a five-foot fuse that he was
using exploded the charge in ten seconds and that he was thereby
thrown down and injured.   Another witness testified to being present
at the time and that the fuse burned in ten seconds.   Still another wit-
ness who had used the tape fuse testified that "it went missed" for him
several times and exploded the checks prematurely.   It burned too
fast.   His partner once lighted a fuse which exploded the charge in
four seconds.   Two other witnesses also testified to premature explo-
sions, caused by the burning of the fuse in less than ten seconds.
These accidents, which resulted in slight injuries to the employees,
were at the time reported by them to the captain of the mine, and
should have warned him of the existence of defects in the fuse.

It does not appear whether the miners at the time of these accidents
were using the Climax or the Ensign & Bickford brands.   Nor does
it clearly appear which of these brands was being used by the respond-
ent at the time he was injured.   We do not see that this is important,
as both brands of tape fuse were in common use in the mine, and they
were for all practical purposes identically alike.   The jury were in-
structed that, unless they were satisfied that both brands of tape fuse
were defective, there could be no recovery, as there was no proof of

the specific kind of tape fuse which was furnished to the plaintiff. The question was whether defective tape fuse was furnished, and the jury found such to be the fact.

Previous accidents under the same or similar circumstances in themselves have a certain evidential character (1 Labatt, Master & Servant, § 137, and cases cited in note 3), and it is well settled that evidence that another person had been injured recently by the same machine or instrumentality, and that the employer had knowledge of the fact, is competent to show notice to the employer of the defective condition. Phelps v. City of Mankato, 23 Minn. 276; Morse v. Minneapolis & St. L. Ry. Co., 30 Minn. 465, 16 N. W. 358; Krogstad v. Northern Pacific Ry. Co., 46 Minn. 18, 48 N. W. 409; Beardsley v. Minneapolis St. Ry. Co., 54 Minn. 504, 56 N. W. 176; Thiel v. Kennedy, 82 Minn. 142, 84 N. W. 657; Byard v. Palace Clothing House Co., 85 Minn. 363, 88 N. W. 998; Spaulding v. Forbes, 171 Mass. 271, 50 N. E. 543, 68 Am. St. 424; Faerber v. Scott, 86 Wis. 226, 56 N. W. 745; 1 Wigmore, Ev. § 252, and cases cited in note to 41 L. R. A. 44. This rule is applicable to a case like the present, where the instrument which was the immediate cause of the accident is one of a kind or class which is furnished by the employer to his workmen. As said by Labatt: "Manifestly it is a reasonable inference that, where several out of a number of appliances modeled upon the same pattern or a closely similar pattern fail to perform their function properly, the master is put upon inquiry as to the suitability of all the others." Master & Servant, § 138; Painton v. Northern, 83 N. Y. 7.

The evidence in this case shows that former accidents of a similar character had happened, and that the mine captain knew that it was claimed that they were caused by premature explosions due to defective fuses. The miners went to him with their complaints. There was also evidence that the reputation of the tape fuse was bad among the workmen. It was the subject of conversation among the men. They preferred the string fuse, and were dissatisfied when the tape fuse was furnished to them. It does not appear that the mine captain knew of this fact; but it is very evident that he would have discovered it, if the slightest investigation had been made after he was notified of the accidents. The mine captain did not have charge of

the matter of purchasing and supplying fuse for the men; but he had sole charge of the underground work, and therefore represented the company for the purpose of receiving notice of defects in the appliances used in such work. A careful examination of the voluminous record in this case, which extends to more than five thousand folios, has satisfied us that the trial court was correct in his conclusion that there is "much evidence in plaintiff's favor, both as to the character of the fuse and the lack of inquiry and inspection of defendant in reference thereto." There was evidence fairly tending to show that the company had notice, actual or constructive, of the fact that parts of the fuse furnished to the men were defective. Reasonable men might differ as to the conclusion which should be drawn from the evidence, and it was therefore properly a question for the jury.

We cannot say that as a matter of law the respondent assumed the risk involved in using the tape fuse. It is true that he was an experienced miner, and as a matter of law assumed the risks incidental to the use of fuse which was reasonably safe; but he did not assume risks due to the negligence of his employer, unless he at the time knew and appreciated the same, and this does not so clearly appear from the evidence as to make the question one of law.

It is claimed that the respondent was doing the work in a negligent manner, particularly in the way in which he used the candles and swab stick, and stood in front of the holes, when there was space on either side where he would have been in safety. There was evidence that this was the usual method of doing the work, and no injury would have resulted in this instance if the fuse had not been defective and exploded the charge prematurely. It cannot be held as a matter of law that respondent was himself negligent.

The assignments of error based upon the instructions given the jury and the reception of evidence are without merit and do not require further consideration. The case was submitted to the jury with instructions which were clear, full, and impartial, and in our opinion the evidence sustains the verdict.

The order of the trial court is therefore affirmed.